**Mohamed ELDEEB, Plaintiff,**

v.

**UNIVERSITY OF MINNESOTA, The Regents of the University of Minnesota, William F. Liljemark, individually and as agent for the University of Minnesota, James Swift, individually and as agent for the University of Minnesota and as agent for Maxillofacial and Oral Surgery, P.A., and Maxillofacial and Oral Surgery, P.A., Defendants.**

No. 3–94–520.

United States District Court,
D. Minnesota,
Third Division.

Sept. 30, 1994.

Susan Broin and Stephen Cooper, for and on behalf of plaintiff.

Del Blocher, for and on behalf of defendant Maxillofacial and Oral Surgery, P.A.

Rebecca Palmer, for and on behalf of the University of Minnesota defendants.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Plaintiff is an oral surgeon and full professor in the Division of Oral and Maxillofacial Surgery in the School of Dentistry at the University of Minnesota. Plaintiff asserts claims of discrimination under 42 U.S.C. § 2000e and Minn.Stat. § 363, breach of contract, defamation and negligent supervision. The claims stem from the events surrounding plaintiff's application for a full professorship and from defendants allegedly shepherding patients away from plaintiff.

### I.

Plaintiff is from Egypt. He received his undergraduate training at the University of Cairo where he earned a B.D.S. degree in 1972. In 1979, he completed his graduate training in Oral and Maxillofacial Surgery. In 1980 he became an assistant professor at the University of Minnesota (University), was promoted to associate professor in 1985 and became tenured in 1986. Currently he is a full professor in the Division of Oral and Maxillofacial Surgery, School of Dentistry at the University.

Defendant Dr. James Swift, also an oral surgeon, is the division head of Oral and Maxillofacial Surgery. The division reports directly to the Department of Diagnostic and Surgical Sciences (Department), which is chaired by Dr. William Liljemark, an orthodontist. Drs. Swift and Liljemark are plaintiff's immediate administrators and supervisors. The Department reports to the Dean of the School of Dentistry, Dr. Richard Elzay. The School of Dentistry is within the University Health Sciences Unit, whose acting interim vice president was Cherie Perlmutter during all times relevant to this case.

Defendant Maxillofacial and Oral Surgery, P.A. (MOS) is a private, for-profit professional Minnesota corporation that was incorporated July 1, 1977. MOS has a contract with the University to treat patients sent to the University School of Dentistry. There are three shareholders of MOS that are full time faculty at the University in the Division of Oral and Maxillofacial Surgery. Plaintiff and Dr. Swift are two of the shareholders. The faculty of the division provide services to patients referred to the University and walk-in patients. MOS handles patient billing, collection, and pays corporate obligations and expenses. MOS also distributes a portion of its income to the University and to its shareholders.

### Promotion

In 1989, plaintiff approached Dr. Liljemark about applying for the position of full professor. At that time, Dr. Liljemark suggested plaintiff apply for a peer review grant and to become board certified in order to enhance his ability to obtain such promotion. Plaintiff did apply for a peer review grant, but has not become board certified to date.

The following year, plaintiff again sought a promotion to full professor. As part of the application process, plaintiff developed a dossier. The School of Dentistry limits an applicant's dossier to 35 pages, yet plaintiff submitted a dossier that exceeded 64 pages which was nonetheless accepted. After closely reviewing plaintiff's dossier, Dr. Liljemark decided he could not support plaintiff's promotion. In a memo dated July 20, 1990, Dr. Liljemark informed plaintiff of the reasons he would not support his promotion:

1) Plaintiff misrepresented his B.D.S. degree as a D.D.S. degree on letters, preprints and papers;

2) Plaintiff allowed the publication of the same data in two different journals without referencing in the second article the first; and

3) Plaintiff represented that he was a Co-Principal investigator in a New York University College grant when Plaintiff was only a 5% Co-Investigator.

In a follow-up memo dated August 2, 1990, Dr. Liljemark informed plaintiff he should approach a senior ranking member of the Department if he wanted to continue the promotion process. Plaintiff then approached Dr. James Little to support his promotion, who agreed to initiate the process on plaintiff's behalf. Plaintiff's dossier was then submitted to the Department for the initial vote.

The full professors of the Department voted on the question of plaintiff's promotion on October 26, 1990. The vote was three to one against promoting plaintiff. Thereafter, the decision of the Department and plaintiff's dossier were forwarded to the School of Dentistry Promotion and Tenure Committee (P & T Committee). On December 18, 1990, the P & T Committee voted unanimously in favor of plaintiff's promotion. The P & T Committee believed that the concerns of Dr. Liljemark and the Department were general in nature and lacked sufficient specificity. Furthermore, the P & T Committee felt plaintiff's responses clarified many of the concerns. Plaintiff's promotion was postponed, however, due to an allegation of research fraud raised by Dr. Liljemark.

In a letter dated December 14, 1990 [1], Dr. Liljemark voiced his concerns regarding plaintiff's allegations of prejudice to Dean Elzay. In this letter, Dr. Liljemark informed the Dean of his role in plaintiff's promotion process, and explained in detail his concerns and his dissatisfaction with plaintiff. Because others in the Department felt the erroneous reporting of data constituted research fraud [2], he felt it his responsibility to raise the allegation in order to initiate an inquiry into whether in fact plaintiff did commit research fraud.

In response to this letter, a meeting was held on January 17, 1991 between Dean Elzay, Cherie Perlmutter and University General Counsel Surrell Brady at which time it was decided to initiate an inquiry panel pursuant to the University's Research Fraud Policy. The inquiry was to be conducted outside the School of Dentistry and Dean Elzay would take no part. It was at this meeting that Dean Elzay decided to postpone his determination as to plaintiff's promotion until after the completion of the inquiry.

Dr. James White, Associate Dean of Medical Research for the University was asked to head the inquiry panel (White Panel) that was charged to address all the concerns in Dr. Liljemark's letter of December 14, 1990. On March 22, 1991 the White Panel found Dr. Liljemark's allegations had a basis in fact. Based on the findings of the White Panel, Cherie Perlmutter initiated the investigation phase of the Research Fraud Policy. A second panel was created which was chaired by Dr. Ronald Phillips, a professor of Agronomy and Plant Genetics (Phillips Panel).

The Phillips Panel met on June 25, 1991 and reviewed the inquiry report prepared by the White Panel. On July 1, 1991, the Phillips Panel adopted the findings of the White Panel that Dr. Liljemark's allegations were based in fact and that each represented unacceptable behavior for faculty members and that administrative action was appropriate. As to research fraud, however, the Phillips Panel determined that although they did not condone plaintiff's actions and that redundant publication of data is not allowed, such actions did not constitute research fraud as defined in the Academic Personnel Policies and Procedures Manual. The investigation was then closed. In August 1991, plaintiff was granted his promotion retroactive to July 1, 1991.

**Salary Increase**

During the academic year 1990–1991, faculty received their first pay raise in a decade.

---

1. Plaintiff alleges this letter was written after the P & T Committee voted in favor of plaintiff's promotion, and backdated to a date prior to the vote. The court finds no basis for this assertion. This issue will be addressed in further detail in the defamation section of this order.

2. Dr. Liljemark relied upon the definition of research fraud contained in the September 1990

Academic Personnel Policies and Procedures Manual:

> Research Fraud is an act of deception ... The term fraud is used here to include a broad range of deceptive practices including:
> 1. Falsification of data—ranging from fabrication to deceptively selective reporting, including the purposeful omission of conflicting data with the intent to falsify the results.

The raises ranged from 2% to 8%. The average raise was 5%. Plaintiff received a 3% raise. The University states the primary reason for this raise was because plaintiff spent insufficient time on clinic responsibilities and his substandard teaching efforts.

## Hospital Privileges

Plaintiff applied for hospital privileges at many area hospitals. To verify information on applications, many of the hospitals utilize two accrediting agencies, the Hennepin County Medical Society and the Ramsey County Society. The University has its own credentials committee (Credentials Committee) to review requests for hospital privileges.

Plaintiff, on his application to the Hennepin County Medical Society submitted in December 1991, misrepresented that he was board certified. In April 1993, upon applying for reappointment to the University Hospital, plaintiff made the same misrepresentation. In both instances, plaintiff blamed his secretary for the misrepresentations appearing on the application.

As part of its process, the Credentials Committee solicits information from the applicant's peers, and supervisors. Such information gathered by the Credentials Committee is privileged and confidential pursuant to state statute. Applicants are asked to sign releases of liability to enhance the free flow of information. Plaintiff signed such a release.

Dr. Swift was asked to provide input on plaintiff's application for reappointment to the University Hospital. In a letter dated May 26, 1993, Dr. Swift expressed his concerns regarding the plaintiff's abilities in certain areas. He noted that plaintiff had been denied privileges at two area hospitals, that plaintiff had applied for privileges for which he was not certified, and that he had misrepresented he was board certified in Oral and Maxillofacial surgery. Dr. Swift also noted concerns of other oral and maxillofacial surgeons suggest plaintiff is not competent to perform orthognathic surgery, and that his clinical privileges had been restricted in the past. Plaintiff was granted full hospital privileges, with a two year restriction wherein he is required to provide case reports on his orthognathic surgery cases.

## Procedural History

On March 21, 1991, plaintiff filed a grievance pursuant to the University's Grievance Policy against Dr. Liljemark, Dean Elzay, and Cherie Perlmutter in response to the creation of the White Panel. Plaintiff alleged violation of the due process and academic freedom provisions of the tenure code. As relief, plaintiff sought his promotion to full professor, that Dr. Liljemark be removed as chair of the Department and that all allegations of fraud be expunged from his files. When plaintiff received his promotion in August 1991, the grievance was dismissed.

On March 28, 1991, plaintiff filed a charge of discrimination based on national origin with the Minnesota Department of Human Rights. Plaintiff alleged he was discriminated against in the promotion process. No determination was made during the pendency of the charge. The Department of Human Rights sent a right to sue letter in March 1993, after plaintiff initiated the present case.

On July 2, 1992, plaintiff filed a second grievance because he felt the first grievance should not have been dismissed. The second grievance was filed solely against Dr. Liljemark alleging abuse of power and violation of the Tenure Code. The first grievance was reopened and consolidated with the second. After a full evidentiary hearing spanning over several days, the Grievance Committee rejected all of plaintiff's claims in a decision dated August 17, 1993. Plaintiff appealed the Grievance Committee's decision, which appeal is currently pending.

Defendants now move the court for summary judgement on each of plaintiff's claims.

## STANDARD

A party is entitled to summary judgment if it can show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court conducts a two-part inquiry to determine whether genuine issues of material fact exist. *Anderson v.*

*Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes as to facts that may affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact is deemed genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.,* at 248–249, 106 S.Ct. at 2510–2511. To successfully oppose a motion for summary judgment, the non-moving party may not rest on mere allegations, but must point to specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e).

**Breach of Contract Claims**

Plaintiff alleges defendants have breached three different contracts. The first breach involves the University of Minnesota Tenure Code (Tenure Code) Sections 1.1 and 1.2. These provisions provide:

> **1.1 Principles.** Every member of faculty is entitled to due process and academic freedom as established by academic tradition and the constitutions and laws of the United States and the State of Minnesota and as amplified by resolutions of the Board of Regents.
>
> **1.2 Protection of Faculty.** Denial of faculty appointment or reappointment or removal or suspension from office or censure or other penalty must not be based upon belief, expression or conduct protected by law or by principles of academic freedom.

It is plaintiff's contention that defendants have breached these two provisions of the Tenure Code by: 1) failing to comply with established procedures for investigating misconduct in research by relying on an interim policy; 2) holding plaintiff's promotion in abeyance until the investigation was completed; and 3) mishandling the misconduct investigation in an untimely manner, breaching its

confidentiality and violating plaintiff's academic freedom.

▪ Defendants argue Sections 1.1 and 1.2 of the Tenure Code are merely policies of the University and as such are insufficiently definite or specific to allow a factfinder to determine whether a breach occurred. In *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983) the court held an employment handbook may create an offer for a unilateral contract if the terms of the offer are specific and communicated to the employee. General statements of policy are no more than that and do not meet contractual requirements. *Id.* The policy must provide for reasonably definite terms to allow a factfinder to interpret and apply in determining whether or not there has been a breach. *Kulkay v. Allied Central Stores, Inc.* 398 N.W.2d 573, 576 (Minn.Ct.App.1986).

In *Miller v. Certain Teed Corp.,* 971 F.2d 167, 171–172 (8th Cir.1992) the court held the following statements in an employment manual were not sufficiently definite to allow a factfinder to determine whether a breach occurred:

> 1. We will treat you fairly and consistently at all times.
> 2. We will respect the dignity of each individual.
> 3. We will recognize the importance of your contribution to our success.
> 4. We will allow you opportunities, insofar as possible, to advance to position which best suits your skills and, consistent with company needs, insures your self-development and job satisfaction.

*Id.*

▪ The Tenure Code provisions at issue in this case are similar to those addressed in *Miller.* The terms "due process" and "academic freedom" are not reasonably definite terms that can be interpreted and applied to determine whether or not there has been a breach.[3]

---

**3.** A review of the alleged "definition" of academic freedom contained in the Appendix of the Tenure Code consists mainly of statements of policy. Contrary to plaintiff's assertion the text does not define "academic freedom". The text does provide a list of activities the University will adhere to in order to protect academic freedom.

The only provision arguably applicable to this case provides:

> 6. If the conduct of a teacher in his classroom or elsewhere should give rise to doubts concerning his fitness for his position, the question should in all cases be submitted first to a committee of the faculty, and in no case should

Plaintiff asserts defendants' argument must fail as the provisions of the Tenure Code specifically state it is part of the "contract between the Board of Regents and every faculty member employed by the University outside of collective bargaining agreements." Tenure Code, Section 2.1.

Defendants do not dispute the Tenure Code is part of the employment contract between the University and its professors. It is defendants' position that plaintiff cannot prove a breach of such contract has occurred because plaintiff alleges only breach of general policy statements. As stated above, the court finds Sections 1.1 and 1.2 are general policy statements that are not definite enough to allow the court to interpret and apply to determine whether or not a breach has occurred.

Plaintiff also asserts the University's Grievance Policy is completely flawed as evidenced by the fact it took two years to complete and that defendants breached such policy by authorizing and utilizing general counsel to act on its behalf. Plaintiff does not support these claims in his moving papers, therefore he has failed to establish a genuine issue of material fact to preclude summary judgment.

■ Plaintiff also asserts the University's nondiscrimination brochure creates a contract, and that defendants have breached the same. The court finds the nondiscrimination brochure is a statement of policy too general to create a contract. *See Elliott v. Montgomery Ward & Co.*, 967 F.2d 1258, 1264 (8th Cir.1992).

■ Finally, the individual defendants, Drs. Swift and Liljemark are entitled to summary judgment as they are not a party to the contracts alleged in plaintiff's complaint. Based on the foregoing, defendants are entitled to summary judgment on all breach of contract claims.

## Defamation

■ For a statement to be considered defamatory, it must be communicated to a third party, be false and tend to harm the plaintiff's reputation in the community and to lower him in the estimation of the community. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). "Truth, however, is a complete defense, and true statements, however disparaging, are not actionable." *Id.*

■ An individual may escape liability for a defamatory statement based upon a qualified privilege. Minnesota law recognizes a qualified privilege which exempts an employer from liability for defamatory statements about an employee so long as the statements are made in good faith and for a legitimate purpose. *Keenan v. Computer Assoc. Int'l, Inc.*, 13 F.3d 1266, 1269 (8th Cir.1994) (citations omitted). A statement may be privileged if made upon a proper occasion, from a proper motive and based upon reasonable or probable cause. *Id.* Actual malice must be proved before a plaintiff may recover. *Id.*

■ The qualified privilege encompasses a two step approach. First, the defendant bears the burden of establishing a proper occasion, motive and probable cause. *Keenan*, 13 F.3d, at 1269. Whether the employer had a proper motive and occasion is a question of law for the court. *Id.* Whether the employer had reasonable or probable cause is generally a question of law "unless the evidence 'permits of more than one conclusion,' then the question becomes one of fact for the jury." *Id.* (citing *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380 n. 4 (Minn.1990)).

■ Malice is defined in Minnesota as "actual ill will, or a design to causelessly and wantonly injure plaintiff." *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn.

any member of the teaching staff be dismissed before the normal termination of his period of appointment without full and open hearing before the Board of Regents, should he desire it, and only upon sufficient notice.
According to this language, defendants needed only to submit doubts concerning plaintiff's fit-

ness for his position to a committee of the faculty. This was done when the White Panel and Phillips Panel investigated the allegation of research fraud. Furthermore, plaintiff's conduct was submitted to the P & T Committee for review. The above provision does not require more.

1986). Whether a qualified privilege has been lost through abuse, that is, by acting with actual malice, is a jury question. *Id.* The court in *Frankson* noted a finding of malice was sustained where there was "evidence from which it might be inferred that the defendant knew of the falsity of some of the statements [and] * * * also some evidence of ill feeling between [defendant's employee] and plaintiff". *Id.,* at 144 (citations omitted).

> Malice may be proved by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege.

■ The allegation of defamation concerning Dr. Liljemark is based upon his December 14, 1990 letter to Dean Elzay, in which Dr. Liljemark addressed his concerns of research fraud by plaintiff.

Defendants argue it is entitled to summary judgment because everything contained in the letter is true and because Dr. Liljemark is protected by the qualified privilege. Although plaintiff does not dispute the facts contained in the letter regarding Dr. Liljemark's concerns of his grant activity, or that he published two articles using the same data without proper reference, the letter nonetheless raises the inference that plaintiff's conduct constitutes research fraud, which was subsequently determined not to be true. Nonetheless, defendants are entitled to summary judgment on this claim as Dr. Liljemark's actions are protected by the qualified privilege. Plaintiff has failed to raise a genuine issue of material fact Dr. Liljemark acted with malice.

Plaintiff argues the letter was created and distributed by Dr. Liljemark for the sole purpose of derailing plaintiff's promotion and harming his reputation. Plaintiff supports his position by asserting the letter was written after the P & T Committee approved his promotion, which was December 18, 1990, and backdated to a date prior to December 18. Plaintiff cites to Dr. Liljemark's deposition testimony in which he stated he did not remember the exact date he forwarded the letter, but that he "waited until the promotion process was completed." Liljemark Dep. T. p. 71. Plaintiff also cites to Dean Elzay's deposition testimony that the meeting was held shortly after he received the letter, and that such meeting was held January 16, 1991. Plaintiff fails to note that Dean Elzay also testified as follows:

A: The same day I got Dr. Liljemark's request, this letter of Exhibit 23 dated 14 of December is the date that I asked for help.

Q: So it would have been December 14th because we have a note from you indicating December 14?

A: Yes, Yes.

Elzay Dep. T., p. 153. Accordingly, there is insufficient evidence to create a genuine issue the letter was backdated.

Plaintiff also argues there is evidence of malice in that at no time prior to the December 14, 1990 letter, did Dr. Liljemark allege plaintiff's activities constituted research fraud nor did he confront plaintiff on the issue even though he was aware of the duplicate reporting since at least July 1990. There is evidence, however, that Dr. Liljemark had scheduled appointments with plaintiff to discuss his promotion during such time period and that plaintiff failed to appear at such meetings.

Additionally, the language of the December 14, 1990 letter does not support a finding of malice. Dr. Liljemark does not accuse plaintiff of research fraud, rather he proffered his opinion that plaintiff's undisputed actions *may* constitute research fraud. The evidence also establishes the extent of publication was limited to necessary parties, Dean Elzay, Cherie Perlmutter and Surrell Brady. The P & T Committee was not sent the letter nor was the letter before it when the vote was taken.

Finally, the evidence supports defendants' assertion that Dr. Liljemark raised the allegations in good faith. Again, the parties do not dispute the underlying facts leading up to the allegations: plaintiff's grant activity and republication of data without proper reference. This is supported by the findings of the White Panel as adopted by the Phillips

Panel. Although the Phillips Panel found such activity did not establish research fraud, the Panel made the following observation:

> Finally, we are left with the redundant publication of tables of data. We believe that this allegation is the most appropriate to be considered as fraud in research, perhaps as 'deceptively selective reporting.' This practice is not acceptable and is specifically not allowed by most journals. Professor Eldeeb offered a weak rationale for the duplicate tables publication in that a related abstract was cited and the second paper might be published before the first. The decision to publish the data again with an obtuse reference to the first paper was a gross misjudgment at best. However, the redundant publication of tables of data does not appear to satisfy any of the three criteria of research fraud as defined in the University's 'Procedures for Dealing with Fraud in Research' Document.

Letter from Professor Ronald L. Phillips to Cherie Perlmutter dated July 1, 1991. (Gonczy Aff.Ex. EE).

Because plaintiff has failed to establish a genuine issue of material fact as to malice, defendants are entitled to judgment on this claim on the basis the December 14, 1990 is protected by a qualified privilege.

■ The allegations of defamation pertaining to Dr. Swift revolve around Dr. Swift's response in the form of the letter dated May 26, 1993, to the Credentials Committee's request for information on plaintiff's application for hospital privileges. In this letter, Dr. Swift raised a number of concerns as to plaintiff's right to hospital privileges. In particular, Dr. Swift noted that plaintiff's clinical privileges to perform orthognathic surgery were limited because of an orthognathic procedure performed by plaintiff in 1989 in which the patient bled more than usual and the procedure took much longer than usual. As a result of this incident, on March 20, 1990, Dr. Swift, as Chief of the Department of Dentistry and acting head of the Division of Oral and Maxillofacial Surgery, informed plaintiff that his clinical privileges were restricted by action of the Department of Dentistry Committee. A review of the Committee's minutes for March 19, 1990 provide the recommendations of the Committee were:

> It was the consensus of the members that Dr. Swift write a letter to the attending dentist communicating to him that the amount of time spent on this case was excessive for the procedures performed.

Plaintiff argues Dr. Swift did not have the authority to restrict plaintiff's clinical privileges. In support of this argument plaintiff cites to the University of Minnesota Hospital and Clinic By–Laws of the Medical and Dental Staff which provides restriction of clinical privileges is to be determined by the Credentials Committee. Part B, Section 3(b). Defendants assert that the Committee did vote to restrict plaintiff's privileges, but that such action was not included in the minutes. Plaintiff has raised a genuine issue of fact as to the falsity of the statement. Defendants can escape liability, however, if the statement is protected by a qualified privilege [4].

Defendants argue that it is not liable for defamation because plaintiff signed an authorization and release when he applied for hospital privileges. The exact language of the release is as follows:

> **Release from Liability.** I hereby release from liability hospitals ... Medical Society, Third Party Payors and their respective agents, and all other individuals, institutions and entities providing information in accordance with the authorizations con-

---

4. Defendants argue that Dr. Swift's response to the Credentials Committee is protected by an absolute privilege pursuant to Minn.Stat. § 145.64, Subd. 1 which provides all information acquired by a review organization is confidential and is not subject to subpoena or discovery. This argument has no merit.

 Minn.Stat. § 145.62 provides that a person providing information to a review organization may be liable in an action for damages if such person provides false information, knowing or having reason to know such information was false. Section 145.64, Subd. 1 also states "[i]nformation, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization ..." The privileges enumerated in § 145.64 are for the benefit of the review organization, not the individuals providing information to the review organization.

tained herein for their acts performed in good faith and without malice in connection with the investigation of this Application for Appointment and the release and exchange of Disciplinary Information authorized above.

Plaintiff asserts Dr. Swift acted with malice in responding to the Credentials Committee. It is plaintiff's assertion that Dr. Swift's motive to restrict plaintiff's ability to perform orthognathic surgery is to ensure Dr. Swift continues to receive the majority of the orthognathic procedures done at the University Hospital and Clinic. Plaintiff presented the court with a report prepared by Richard C. Hoyt that shows Dr. Swift received 70% of such procedures during the last four years. Plaintiff also notes such procedures generate the most income.

Defendants do not dispute the fact that Dr. Swift receives a majority of the orthognathic procedures, but states he receives them through referrals and requests because of his national stature.

In rebuttal, plaintiff has provided affidavits from himself and another oral surgeon that the receptionist, Sandy Harsh, was told to schedule certain procedures only with Dr. Swift and Dr. Diehl. This evidence is sufficiently rebutted, however, through Dr. Swift's deposition testimony in which he stated he never told the receptionist to schedule patients away from plaintiff or any other oral surgeon and through the affidavit of Sandy Harsh in which she denies she, or any other receptionist, were ever instructed or directed to channel patients away from plaintiff. Ms. Harsh also reaffirmed the fact that Dr. Swift receives the majority of patients from direct referrals. As plaintiff has failed to raise a genuine issue of material fact as to malice, the University and Dr. Swift are not liable to plaintiff for defamation.

■ Defendant Maxillofacial and Oral Surgery, P.A. is also entitled to summary judgment on the claim of defamation as the letter at issue was written by Dr. Swift in his capacity as Clinical Chief of the Department of Hospital Dentistry and Director of Oral and Maxillofacial Surgery at the University. The letter was also written on University letterhead. Given the nature and purpose of

the corporation is to handle patient billing and accounting, plaintiff has failed to allege any facts with which to support his claims against MOS.

**Discrimination**

Plaintiff alleges defendants discriminated against him in the following manner:

1) restricting the number of pages of his dossier to 35 pages;

2) requiring him to pay the costs associated with correcting his promotion documentation;

3) withholding plaintiff's promotion until after the completion of the inquiry into research fraud;

4) restricting patient scheduling so that prospective candidates for surgical care were shepherded to other doctors other than plaintiff; and

5) providing plaintiff a 3% increase in salary while the average increase was 5%.

Plaintiff alleges discrimination based on race, national origin and religion under Title VII, 42 U.S.C. § 2000e et. seq. and Minn. Stat. § 363 et. seq. In March 28, 1991 plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights. In the charge, plaintiff alleged national origin discrimination based upon the fact that Dr. Myer Leonard baited him into political discussions about the Mideast; that Dr. Liljemark restricted his dossier to 35 pages and required him to pay secretarial costs; that Dr. Liljemark refused to support his promotion; and Dr. Liljemark accused him of research fraud.

■ The law is clear that a condition precedent to bringing an action under Title VII is filing a charge with an equal employment opportunity agency. *See, Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Plaintiff concedes he did not file a charge with regard to allegations of discriminatory salary increase and patient shepherding. Accordingly, defendants are entitled to summary judgment on plaintiff's claims under Title VII, 42 U.S.C. § 2000e based upon dis-

criminatory salary increase and patient shepherding. Those claims survive under Minn. Stat. § 363, however, as filing an administrative charge is not a condition precedent to recovery under that statute.

■ A plaintiff claiming discrimination has the initial burden of establishing a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668 (1973). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to produce evidence of legitimate reasons for its actions. *Id.* The burden then shifts back to plaintiff to prove the legitimate reasons proffered are pretextual. *Id.*

■ Defendant argues that it has articulated legitimate, nondiscriminatory reasons for its actions and that plaintiff has failed to prove pretext. Defendants have provided evidence that all candidates for promotion in the School of Dentistry must limit their dossiers to 35 pages, yet plaintiff was allowed to submit a dossier exceeding 64 pages. Defendant also provides evidence that plaintiff received more secretarial help than other candidates. Finally, plaintiff received his promotion to full professor.

Plaintiff argues, however, that his promotion was delayed for discriminatory reasons. As discussed herein, the evidence establishes there was sufficient bases for bringing the research fraud allegation and that such allegation was made in good faith and without malice. Given the serious nature of the allegation, the University had legitimate reasons for delaying the promotion until the investigation was completed. Furthermore, once the promotion was approved, it was done so retroactive to July 1. Pursuant to University policy, promotions, whenever granted during a given year, become effective July 1 pursuant to University policy.

Plaintiff also fails to provide evidence of pretext as to the allegation of patient shepherding. Patients are scheduled with doctors through referrals and patient requests and the reason plaintiff treats fewer patients is because he does not receive referrals or requests. As previously discussed, there is no merit to plaintiff's assertions that receptionists were instructed to schedule certain procedures only with Dr. Swift or Dr. Diehl.

Plaintiff submitted a statistical analysis of Richard C. Hoyt in support of his claim. The analysis purports to establish that the distributions of surgical procedures occurring by chance is zero, therefore there is bias in the selection procedures. The fatal flaw to Hoyt's analysis, however, is that it is based on the assumption there is an equal chance of each dentist in MOS performing orthognathic surgery in each year analyzed. Plaintiff does not provide evidence of a University policy that guarantees each dentist equal patient access. Dentists in MOS receive patients through referrals or requests. There is no rule or policy prohibiting a dentist from receiving more referrals than others.

The Hoyt Analysis also addresses the claim of discriminatory salary increases for the professors in the School of Dentistry. Plaintiff has alleged he received a 3% salary increase because of race, national origin and religion. Defendants state plaintiff received a salary increase of 3% because of he spent insufficient time on clinic responsibilities and because of his substandard teaching effort. To establish pretext, plaintiff has submitted an analysis that purports to establish third world trained dentists, with equal training, expertise and number of years in rank as other dentists at the University, are paid on an average $15,553.54 less.

■ Third world trained dentists are not a protected class. Any person, of any race or national origin, can be included in such a classification if they are trained in the third world. Furthermore, contrary to Hoyt's assertion, there is no evidence that his analysis takes "expertise" into consideration. The analysis is based on information provided in Table 1 and Figure 1, which provides information only as to salary and years in rank. Accordingly, the analysis does not take into consideration legitimate reasons for the salary discrepancies.

In *Tagatz v. Marquette University*, 861 F.2d 1040, 1043 (7th Cir.1988), the court addressed a similar analysis which was presented in an attempt to prove catholic professors were paid more than non-catholic professors.

The court rejected the analysis because it did not take into consideration other factors that could account for the salary differences, such as productivity and scholarly achievements.

> All that the data show is that there is in all likelihood a real, not a spurious, difference between the means of the samples compared. The data do not show that the difference is due to a particular attribute (namely, being catholic) which the members of the better-off group have and the members of the worse-off group lack. Correlation is not causation.

*Id.* (citing *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395, 400 (2nd Cir.1981)).

Plaintiff argues that the court must accept the Hoyt analysis as true as defendants did not rebut such analysis with its own statistics. Because the flaws of Hoyt's analysis are glaring, the court need not wait for defendants to point them out. *See, Tagatz,* at 1044 (Judges are not wallflowers or potted plants and should be commended for testing the strength of·a party's statistical evidence.)

### Negligent Supervision

 Plaintiff alleges the University has a duty to take reasonable steps to supervise and train their management and work force to protect its employees from harm and that defendants knew or should have known of the defamatory and discriminatory conduct of its employees. In Minnesota, a negligent supervision claim is generally governed by § 213 of the Restatement (Second) of Agency. *Schibursky v. IBM,* 820 F.Supp. 1169, 1185 (D.Minn.1993). The parameters of the duty or the types of claims arising of out negligent supervision have not yet been defined in Minnesota. *Id.* Generally, the question of whether an employer exercised reasonable care is a question for the jury. *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn.1983). In this case, however, there is no evidence of negligence with which to support this cause, therefore summary judgment is appropriate.

The University followed all procedures with regard to plaintiff's promotion as well as the investigation into the allegation of research fraud. Furthermore, plaintiff received his promotion retroactive to the date all promotions are affected. Defendants are entitled to summary judgment on this claim.

### ORDER

Accordingly, based upon the above, and all files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the motion of Defendants University of Minnesota, The Regents of the University of Minnesota, Dr. William Liljemark and Dr. James Swift is **GRANTED;** and the motion of Defendant Oral and Maxillofacial Surgery, P.A. is **GRANTED.**