60 F.3d 423
 68 Fair Empl.Prac.Cas. (BNA) 1173,
66 Empl. Prac. Dec. P 43,625, 101 Ed. Law Rep. 682
 Mohamed EL DEEB, Appellant,
v.
UNIVERSITY OF MINNESOTA; Regents of the University of
Minnesota; William J. Liljemark, Individually and as Agent
for the University of Minnesota; and James Swift,
Individually and as Agent for the University of Minnesota, Appellees,
and
Maxillofacial and Oral Surgery, P.A., and James Swift, as
Agent for Maxillofacial and Oral Surgery, P.A., Defendants.
 No. 94-3642.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1995.
Decided July 12, 1995.
 
 Stephen W. Cooper, Minneapolis, MN, argued for appellant (Todd P. Young and Susan E. Broin, St. Paul, MN, on brief).
 Richard Alan Kempf, Minneapolis, MN, argued for appellees (Rebecca Palmer, on brief).
 Before WOLLMAN, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 Dr. Mohamed El Deeb, who is Egyptian by birth, began teaching at the School of Dentistry at the University of Minnesota in 1980. He was a tenured associate professor by mid-1990, when he advised Dr. William Liljemark, his department chairman, that he wanted to apply for promotion to full professor, effective in mid-1991. Dr. Liljemark indicated that he would not support Dr. El Deeb's promotion but suggested that Dr. El Deeb ask another department member to sponsor him (which Dr. El Deeb did). Later in 1990, the eligible department faculty voted three to one (with two abstentions) to deny Dr. El Deeb's promotion to full professor. About six weeks after the department vote, however, the promotion and tenure committee of the School of Dentistry voted nine to zero to grant Dr. El Deeb's promotion to full professor. The next step in the decision process was a recommendation by the dean of the School of Dentistry.
 
 
 2
 Around the time of the promotion and tenure committee vote, Dr. Liljemark wrote to the dean of the School of Dentistry to explain his reasons for not supporting Dr. El Deeb's promotion. In that letter, Dr. Liljemark cited "inconsistencies in Dr. El Deeb's curriculum vitae regarding the reporting and submitting of grant proposals and of redundant publications" and suggested that "a formal inquiry" be made into Dr. El Deeb's "research and scholarly activity." Specifically, Dr. Liljemark stated that Dr. El Deeb had represented on his curriculum vitae that he was a principal investigator on a $500,000 research proposal funded by NIH but that, in fact, Dr. El Deeb was only a co-investigator with 5 percent effort on the proposal, which was never funded by NIH. Dr. Liljemark also stated that two articles written by Dr. El Deeb appeared to be based on the same research data and therefore might be considered to be research fraud, since neither article referred to the other, thus allowing the impression that "the two publications were the result of two different and separate studies." Finally, Dr. Liljemark expressed his "serious doubt and mistrust ... for Dr. El Deeb's integrity" and ability "to evaluate what are acceptable ethical practices."
 
 
 3
 In response, the dean of the School of Dentistry consulted with the university vice-president for health science affairs, who then appointed a panel of three faculty members "to conduct an inquiry into the specific allegations" made by Dr. Liljemark. That panel (called the White panel after its chairman) found that Dr. Liljemark's statements had "a basis in fact." The White panel considered the additional question of whether Dr. El Deeb had misrepresented his B.D.S. degree as a D.D.S. degree "on letters, preprints and papers." (That question apparently surfaced as a result of a letter that Dr. Liljemark wrote to Dr. El Deeb, listing the reasons why Dr. Liljemark would not support Dr. El Deeb's promotion.) The White panel found that that suggestion was, "indeed, based on fact."
 
 
 4
 The university vice-president for health science affairs appointed a second panel of three faculty members "to further consider the allegations" against Dr. El Deeb, with particular attention to whether those actions violated the university's administrative policies on fraud in research. In mid-1991, that panel (called the Phillips panel after its chairman) accepted the White panel's conclusion that the statements were "based in fact," commented that those actions were "unacceptable behavior for a faculty member," and suggested that "administrative action" would be appropriate. The Phillips panel noted, however, that Dr. El Deeb had corrected his curriculum vitae with respect to the research proposal; the Phillips panel also noted that Dr. El Deeb had corrected the description of his degree "since being challenged" and concluded that "the intent of the misrepresentation [was] not clear," because both B.D.S. and D.D.S. degrees were undergraduate degrees.
 
 
 5
 With respect to "the redundant publication of tables of data," the Phillips panel commented that that allegation was "the most appropriate to be considered as fraud in research" under university administrative policies and that the "practice [was] not acceptable and [was] specifically not allowed by most journals." The Phillips panel characterized Dr. El Deeb's actions in that regard as "a gross misjudgment at best." The Phillips panel concluded, however, that that "redundant publication of tables of data [did] not appear to satisfy any of the three criteria of research fraud" specifically defined in university administrative policies. For that reason, the Phillips panel recommended that no further investigation be made, since the panel did not believe that a "case of intentional perversion of truth" had been established. In September, 1991, Dr. El Deeb was promoted to full professor, effective in mid-1991 (other candidates for promotion that year were approved in May, 1991, effective in mid-1991).
 
 
 6
 In early 1993, Dr. El Deeb filed a lawsuit in federal district court, alleging defamation and discrimination on account of national origin. He named Dr. Liljemark, Dr. James Swift (one of four division heads under Dr. Liljemark, the department chairman), and the university as defendants. In September, 1994, the district court granted summary judgment to all defendants. See Eldeeb v. University of Minnesota, 864 F.Supp. 905 (D.Minn.1994). Dr. El Deeb appeals. We affirm the district court.
 
 I.
 
 7
 Dr. El Deeb contended that Dr. Liljemark's letter to the dean of the School of Dentistry was defamatory. The district court held that Dr. El Deeb had failed to establish the existence of a genuine issue of material fact with respect to actual malice on Dr. Liljemark's part and, therefore, that Dr. Liljemark was protected by the qualified privilege attached to statements of an employer about an employee that are made in good faith and for a legitimate purpose, see, e.g., Keenan v. Computer Associates International, Inc., 13 F.3d 1266, 1269-70 (8th Cir.1994). See Eldeeb v. University of Minnesota, 864 F.Supp. 905, 912-14 (D.Minn.1994).
 
 
 8
 On appeal, Dr. El Deeb contends that he submitted evidence to suggest that Dr. Liljemark did not write the letter until after the promotion and tenure committee voted in favor of Dr. El Deeb's promotion to full professor (even though the letter was dated four days before that vote) and therefore that Dr. Liljemark was motivated by actual malice, rather than good faith and a legitimate purpose, see, e.g., Keenan, 13 F.3d at 1269-70, in sending the allegedly backdated letter (since he was "dismayed" by the committee vote and wanted to "derail[ ]" Dr. El Deeb's promotion). That evidence was a statement from Dr. Liljemark's deposition that "I don't know exactly when it was sent. But I was very careful not to send it until the Promotion and Tenure Committee had met." The dean testified in his deposition, however, that he received the letter on the day it was dated; his testimony was supported by a note dated that same day from the dean transmitting Dr. Liljemark's letter to the university vice-president for health science affairs, by the dean's deposition testimony that he forwarded the letter to the university vice-president on that same day, and by the university vice-president's deposition testimony that she "never had any reason" to conclude that Dr. Liljemark's letter had been backdated.
 
 
 9
 The district court found "no basis" for the assertion that Dr. Liljemark's letter had been backdated. See Eldeeb, 864 F.Supp. at 909 n. 1. The district court also noted that the letter suggested only that Dr. El Deeb's actions might "possibly" be fraudulent, that publication of the letter was limited to necessary parties, that the letter was not before the promotion and tenure committee when it voted, and that the Phillips panel commented on the unacceptability of Dr. El Deeb's actions despite its conclusion that those actions did not technically constitute research fraud. See id. at 913-14.
 
 
 10
 Assuming for the sake of argument that the question of whether Dr. Liljemark's letter was backdated is a material one, we observe that the district court was ruling on a motion for summary judgment and therefore should not have made what seems to be either a credibility judgment--by concluding that "no basis" existed for the allegation that Dr. Liljemark backdated his letter to the dean, see id. at 909 n. 1--or a factual finding from conflicting evidence--by concluding that the letter was written and sent prior to the promotion and tenure committee vote, see id. at 913. We agree, nonetheless, that Dr. El Deeb has failed to establish the existence of a genuine issue of material fact with respect to actual malice on Dr. Liljemark's part. That is because there was direct evidence of probable cause for Dr. Liljemark's action in writing the letter.
 
 
 11
 Under Minnesota law, actual malice is defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." McBride v. Sears, Roebuck and Co., 306 Minn. 93, 235 N.W.2d 371, 375 (1975) (en banc ). " 'Malice may be proved by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege.' " Frankson v. Design Space International, 394 N.W.2d 140, 144 (Minn.1986) (en banc ), quoting Friedell v. Blakely Printing Co., 163 Minn. 226, 203 N.W. 974, 976 (1925), with internal citation omitted. When the only evidence presented of actual malice is that it was an alternative reason for the defendant's action, see, e.g., Frankson, 394 N.W.2d at 144-45, and there is "direct evidence" that probable cause existed for the action taken, id. at 145, no jury question exists with respect to actual malice. See, e.g., id.; see also Michaelson v. Minnesota Mining and Manufacturing Co., 474 N.W.2d 174, 181-82 (Minn.Ct.App.1991); McIntire v. State, 458 N.W.2d 714, 720 (Minn.Ct.App.1990), cert. denied, 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991); Karnes v. Milo Beauty and Barber Supply Company, Inc., 441 N.W.2d 565, 568-69 (Minn.Ct.App.1989); and Kletschka v. Abbott-Northwestern Hospital, Inc., 417 N.W.2d 752, 756 (Minn.Ct.App.1988).
 
 
 12
 Dr. El Deeb offered no other statements or actions by Dr. Liljemark to support the allegation of actual malice. Not just one, furthermore, but two faculty panels concluded that Dr. Liljemark's statements about Dr. El Deeb's actions had a basis in fact, which we consider to be analogous to probable cause. We therefore affirm the district court with respect to its conclusion that Dr. El Deeb failed to establish the existence of a genuine issue of material fact on the question of Dr. Liljemark's actual malice.
 
 II.
 
 13
 In spring, 1993, Dr. El Deeb applied for reappointment to the staff of the University of Minnesota Hospital. The credentials committee for the hospital, which evaluates all such applications, asked Dr. Swift, as clinical chief of the department of hospital dentistry and as director of the division of oral surgery (both positions in the School of Dentistry), for an assessment of Dr. El Deeb's capabilities.
 
 
 14
 By letter, Dr. Swift expressed "several concerns" about Dr. El Deeb. First, Dr. Swift noted that, "in the recent past," it had come to his attention that Dr. El Deeb was "viewed by oral ... surgeons that he has worked with as not competent to perform orthognathic surgery [related to malposition of the bones of the jaw] and various surgical procedures." Dr. Swift also stated that Dr. El Deeb's "clinical privileges had been restricted or denied by prior administrators" in the division of oral surgery. Dr. El Deeb considered those statements defamatory. (Despite Dr. Swift's letter, the credentials committee for the hospital granted Dr. El Deeb's application for reappointment in early 1994.)
 
 
 15
 The district court held that the statements were protected by the same qualified privilege that was asserted with respect to Dr. Liljemark's letter. See Eldeeb v. University of Minnesota, 864 F.Supp. 905, 914-15 (D.Minn.1994). The district court further found that Dr. El Deeb had failed to establish the existence of a genuine issue of material fact with respect to actual malice on Dr. Swift's part and therefore that Dr. Swift was entitled to summary judgment on that claim. See id. at 915.
 
 
 16
 On appeal, Dr. El Deeb argues that he did offer evidence of actual malice sufficient to defeat the motion for summary judgment. That evidence was a report showing that after Dr. Swift became director of the division of oral surgery, he garnered a large majority of the orthognathic surgery cases--and the concomitant fees--accepted by the clinic at the School of Dentistry. The desire to continue receiving that large supplementary income was Dr. Swift's motive, according to Dr. El Deeb, for denigrating Dr. El Deeb's capabilities, and accounted for the malice attributed to Dr. Swift. Additional evidence of that motive, according to Dr. El Deeb, was his own affidavit that the scheduling receptionist at the clinic had "received an instruction not to schedule [orthognathic surgery] patients" with him but instead to schedule them with Dr. Swift. Dr. El Deeb also offered an affidavit from a former faculty member at the School of Dentistry; that affidavit asserted as well that the scheduling receptionist at the clinic had "been personally instructed" not to schedule orthognathic surgery patients with Dr. El Deeb. The affidavit stated that the former faculty member was "familiar with the scheduling practices because of [his] work" at the School of Dentistry.
 
 
 17
 In response, Dr. Swift acknowledged that he received the lion's share of the orthognathic surgery cases accepted by the clinic but presented evidence that the reason for that fact was that he received direct referrals from many dentists and doctors. Dr. El Deeb, in contrast, according to Dr. Swift, relied on "walk-in" patients and those without a referral to a specific faculty member. Dr. Swift also offered an affidavit from the scheduling receptionist at the clinic; that affidavit asserted that Dr. Swift had never requested that orthognathic surgery patients be "channel[ed]" away from Dr. El Deeb or "shepherd[ed]" specifically to Dr. Swift. Finally, Dr. Swift offered his own deposition, in which he denied any knowledge of the clinic scheduling receptionist's having been directed, by him or by anyone else, to send orthognathic surgery patients only to him and not to Dr. El Deeb.
 
 
 18
 The district court described all of the evidence submitted on the defamation claim against Dr. Swift and then held that Dr. El Deeb had failed to establish the existence of a genuine issue of material fact with respect to actual malice on Dr. Swift's part. See Eldeeb, 864 F.Supp. at 915. In doing so, the district court rejected the affidavits of Dr. El Deeb and the former faculty member, stating that the testimony in Dr. Swift's deposition and the affidavit from the scheduling receptionist at the clinic "sufficiently rebutted" the affidavits submitted by Dr. El Deeb. See id.
 
 
 19
 Because those affidavits were submitted in the context of a motion for summary judgment, the district court should not have made what appears to be either a credibility judgment or a factual finding from conflicting evidence, by ruling that the affidavits submitted by Dr. El Deeb had been "rebutted," see id., by the evidence presented by Dr. Swift. We hold, nonetheless, that Dr. El Deeb has failed to establish the existence of a genuine issue of material fact with respect to actual malice on Dr. Swift's part. That is because the affidavits submitted by Dr. El Deeb do not satisfy the requirements of the federal rules.
 
 
 20
 Fed.R.Civ.P. 56(e) requires that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge. See, e.g., Cummings v. Roberts, 628 F.2d 1065, 1069 (8th Cir.1980), and Doza v. American National Insurance Co., 314 F.2d 230, 232 (8th Cir.1963) (per curiam ). In evaluating evidence related to possible summary judgment, a court may not consider affidavits that do not satisfy the requirements of Fed.R.Civ.P. 56(e). See, e.g., Friedel v. City of Madison, 832 F.2d 965, 970 (7th Cir.1987); see also Kern v. Tri-State Insurance Co., 386 F.2d 754, 756 (8th Cir.1967).
 
 
 21
 Dr. El Deeb stated in his affidavit that he "disagree[d]" that the majority of his cases came from "walk-in" patients and nonspecific referrals rather than direct referrals. He "challenge[d]" Dr. Swift to document those assertions "by providing statistics and numbers." Dr. El Deeb also stated in his affidavit that the scheduling receptionist at the clinic "had received an instruction not to schedule [orthognathic surgery] patients" with him. The affidavit of the former faculty member asserted the same thing, adding only that he was "familiar with the scheduling practices because of [his] work" at the School of Dentistry.
 
 
 22
 Since the scheduling receptionist's own affidavit provided percentages of patients for each faculty member and denied that she had received any instruction regarding orthognathic surgery patients, Dr. El Deeb was under the obligation to "set forth specific facts," see Fed.R.Civ.P. 56(e), controverting those percentages and that denial. In our view, he failed to do so.
 
 
 23
 Neither affidavit specified, for example, any different percentages or how the affiant knew of the alleged "instruction," when it was given, in whose presence it was given, or even by whom it was given. Dr. El Deeb's statements that he "disagree[d]" with the percentages given and that the scheduling receptionist's denial was "incorrect" and that he had "concerns" about it were thus insufficient to establish the existence of a genuine issue of material fact with respect to either the percentage question or the alleged "instruction." See, e.g., United States v. Lot 9, Block 2 of Donnybrook Place, 919 F.2d 994, 998 (5th Cir.1990); Shane v. Greyhound Lines, Inc., 868 F.2d 1057, 1061 (9th Cir.1989); In the Matter of Morris Paint and Varnish Co., 773 F.2d 130, 135 (7th Cir.1985); Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir.1985); and Baxter v. Railway Express Agency, Inc., 455 F.2d 693, 696 (6th Cir.1972), cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). We therefore affirm the district court's ruling that Dr. Swift was entitled to summary judgment on the question of actual malice.
 
 III.
 
 24
 Dr. El Deeb contended that the defendants discriminated against him on the basis of national origin by delaying his promotion to full professor pending the university's inquiry into the allegations of research fraud, by directing clinical patients away from him, and by giving him a salary increase of only 3 percent for the year following his promotion to full professor (when the average salary increase was 5 percent). See Eldeeb v. University of Minnesota, 864 F.Supp. 905, 915 (D.Minn.1994). The district court held that although Dr. El Deeb had established a prima facie case of discrimination on the basis of his Egyptian national origin, he had failed to establish pretext after the defendants had articulated legitimate, nondiscriminatory reasons for their actions, see, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 807, 93 S.Ct. 1817, 1824-25, 1827, 36 L.Ed.2d 668 (1973). See Eldeeb, 864 F.Supp. at 916.
 
 
 25
 With respect to the delay in Dr. El Deeb's promotion, the district court stated, the university "had legitimate reasons for delaying the promotion until the investigation was completed," given "the serious nature of the allegation" of research fraud, the "sufficient bases for bringing" that allegation, and the fact that it "was made in good faith and without malice." See id. The district court also pointed out that Dr. El Deeb's promotion was effective in mid-1991, the same time it would have been effective without the investigation. See id.
 
 
 26
 With respect to the contention of "patient shepherding," see id., Dr. El Deeb submitted a "statistical analysis ... purport[ing] to establish that the distribution[ ] of surgical procedures occurring by chance is zero, [and] therefore [that] there is bias in the selection procedures." See id. The district court rejected that analysis (called the Hoyt report by the parties), however, holding that its "fatal flaw ... is that it is based on the assumption [that] there is an equal chance of each dentist [at the clinic] performing orthognathic surgery in each year analyzed." See id. The district court noted that faculty members at the clinic "receive patients through referrals or requests" and that there was "no rule or policy prohibiting [one] dentist from receiving more referrals than others." See id.
 
 
 27
 With respect to the 3 percent salary increase that Dr. El Deeb received for the year after his promotion, the district court stated that the defendants had submitted evidence that Dr. El Deeb received a lower salary increase because "he spent insufficient time on clinic responsibilities and because of his substandard teaching effort." See id. Dr. El Deeb submitted in rebuttal a statistical analysis (part of the Hoyt report) "purport[ing] to establish [that] third world trained dentists, with equal training, expertise and number of years in rank as other dentists" at the university, were paid approximately $15,550 less per year. See id. The district court rejected that analysis, however, holding both that dentists trained in the third world were not a protected class and that there was no evidence that the analysis took expertise into consideration. See id. The district court described the flaws of the Hoyt report as "glaring." See id. at 917.
 
 
 28
 Because the district court was ruling on a motion for summary judgment, it should not have made what appears to be either a credibility judgment or a factual finding from conflicting evidence, by stating that Dr. El Deeb had failed to "prove pretext." See id. at 916. We believe, nonetheless, that Dr. El Deeb has failed to establish the existence of a genuine issue of material fact on the question of discrimination by the defendants. That is because the affidavits and the statistical report that he submitted to support his claims of discrimination either fail to meet the requirements of Fed.R.Civ.P. 56(e) or are insufficient as a matter of law.
 
 
 29
 The affidavits from Dr. El Deeb and the former faculty member are as insufficient under the federal rules for the discrimination claims as they are for the defamation claim against Dr. Swift. We turn, then, to the statistical report.
 
 
 30
 For evidence to establish a genuine issue of material fact on his three claims of discrimination, Dr. El Deeb relied primarily on a statistical report purporting to show differences in the number of clinical patients and salary level correlated to whether a faculty member was trained in the United States or Europe, or in the "third world." With respect to the number of clinical patients, the report stated that its purpose was to "assess the likelihood of observed surgical procedures occurring by chance as a basis for determining the presence or absence of bias in the selection process" for the faculty member to perform those procedures.
 
 
 31
 Since the defendants had already conceded that Dr. El Deeb received a smaller proportion of clinical assignments, we do not see the relevance of such an assessment. The real question is whether the difference in clinical assignments was due to discrimination, as Dr. El Deeb contended, or to some other reason, as the defendants contended--i.e., a difference in the number of direct referrals to each faculty member, specifically, Dr. El Deeb and Dr. Swift. There was clearly a "bias in the selection process," in the sense of disproportional distribution; no one disputed that. The issue is whether that disproportion was derived from national origin or geographical area of training, or from some other factor. See, e.g., Tagatz v. Marquette University, 861 F.2d 1040, 1044 (7th Cir.1988). We see nothing whatever in the report or anywhere else in the record to support Dr. El Deeb's contention that the disproportion was attributable to national origin or to where a faculty member was trained rather than to experience, expertise, reputation, or some other consideration.
 
 
 32
 The same flaws are present in the section of the report allegedly testing whether salary levels are "significantly different" for faculty members trained in the United States or Europe rather than in the "third world." The report stated that it compared faculty members "with equal training, expertise and number of years in rank." The report offered the conclusion that "after controlling for the number of years in rank," the analysis showed an average annual salary of approximately $15,550 less for faculty members trained in the "third world." As the district court pointed out, however, there was no mention of any control for expertise, see Eldeeb, 864 F.Supp. at 917, nor, we note, for research efforts, number of publications, teaching evaluations, or service to the university. See, e.g., Tagatz, 861 F.2d at 1043-45.
 
 
 33
 Dr. El Deeb offered no other evidence tending to show discrimination by the defendants. Under those circumstances, we agree with the district court that the statistical analysis submitted by Dr. El Deeb was insufficient as a matter of law to establish the existence of a genuine issue of material fact on the question of discrimination by the defendants. See, e.g., Goetz v. Farm Credit Services, 927 F.2d 398, 405-06 (8th Cir.1991); see also Adams v. West Publishing Co., 25 F.3d 635, 636 (8th Cir.1994) (per curiam ).
 
 IV.
 
 34
 For the reasons stated, we affirm the judgment of the district court.