**Rozmeree FRENCH, Plaintiff,**

**v.**

**EAGLE NURSING HOME, INC., a Minnesota Corporation; Eagle Nursing Home and Convalescent Center, Inc., a Minnesota Corporation; William J. Eagle, individually and in his capacity as Chief Executive Officer; Steven Winthrop, individually and in his capacity as Officer; Jan Andreen, individually and in her capacity as Director of Nursing; Marci Martinson, individually and in her capacity as Assistant Director of Nursing; and Kathy Johnson, individually and in her capacity as Nurse Manager, Defendants.**

**Civ. File No. 3–96–67.**

United States District Court,
D. Minnesota,
Third Division.

Aug. 5, 1997.

Christopher Robert Walsh, Walsh Law Office, Minneapolis, MN, for Rozmeree French.

Samuel D. Orbovich, Thomas L. Skorczeski, Orbovich & Gartner, St. Paul, MN, for Eagle Nursing Home, Inc., William J. Eagle, Jan Andreen, Marci Martinson, Kathy Johnson.

Joseph W. Anthony, Leny K. Wallen–Friedman, Gena Anne Braaten, Fruth & Anthony, Minneapolis, MN, for Eagle Nursing Home and Convalescent Center, Inc., Steven Winthrop.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon the Motion for Summary Judgment of Defendants Eagle Nursing Home, Inc., Jan Andreen, Marci Martinson, Kathy Johnson, and the Estate of William J. Eagle (collectively, the "Eagle Defendants"), and upon the Motion for Summary Judgment of Defendants Eagle Nursing Home and Convalescent Center, Inc. and Steven Winthrop. For the following reasons, the Court grants Defendants' motions.

### BACKGROUND

Plaintiff Rozmeree French, a licensed practical nurse ("LPN"), began working for Defendant Eagle Nursing Home ("Eagle") on January 19, 1992. Initially, she was the "charge nurse" on the night shift, in charge of care for up to eighty residents. French also supervised the Certified Nursing Assistants who worked with her on the night shift. French was employed in this capacity until approximately May 1993, when she moved to

the day shift. Until that time, the nursing supervisors had not directly observed French's job performance, although Defendant Jan Andreen, the Director of Nursing, had written evaluations in April and May 1992 stating that she felt that French satisfied the requirements of her position. In June 1992, Andreen sent French a memorandum criticizing several of her practice habits. An independent pharmacy consultant noted some problems with French's handling of medications in March 1993. The same consultant noted improvement in a second evaluation six months later. In April 1993, French received an written evaluation indicating that more than thirteen separate areas of practice needed improvement. On June 3, 1993, Defendant Marci Martinson, Eagle's Assistant Director of Nursing, conducted a day-long follow-up reorientation with French for the purpose of improving on these problem areas. Shortly thereafter, during the summer of 1993, Defendant Kathy Johnson, a Nurse Manager, observed French's inability to start oxygen flowing to a patient. Johnson stepped in to begin the oxygen flow successfully and then reported the incident to Andreen.

By April 1993, Eagle had hired several male LPNs. The new male LPNs allegedly were paid more than female LPNs with the same or more experience. French maintains that by early May 1993, she had questioned Defendant William Eagle [1] about this pay policy, had requested a raise, and had been told to discuss the matter with Andreen. French did so, but her complaint was not documented or investigated. French also asked Defendant Steven Winthrop, Eagle's Controller, about receiving a raise on several occasions. Winthrop told French that he was working on the problem but claims not to have told her that he had the authority to authorize pay raises. According to French, Defendants Martinson and Johnson also were aware of French's numerous complaints about the pay disparity between male and female LPNs at Eagle. French contends that she began to receive negative performance reviews shortly after making her initial complaints about unequal pay to William Eagle, Winthrop, and Andreen.

On October 12, 1993, French was caring for Resident E.L., a resident with terminal lung cancer. Johnson instructed French to pay special attention to this resident, who had been prescribed morphine on an as-needed basis. The Eagle nursing staff had administered morphine to Resident E.L. three times the previous day. French did not administer morphine to Resident E.L. at any time during her shift and did not take the resident's vital signs or chart her progress until the end of her shift. When Johnson asked French midway through her shift whether French had given Resident E.L. any medication, French responded that she had administered Resident E.L.'s "eight o'clock scheduled med." (French Dep. at 133–34.) At the end of French's shift, Johnson asked whether French had given the patient any morphine. French informed Johnson that she had not. There is conflicting testimony about precisely what was said in these two conversations between French and Johnson and about the surrounding circumstances, including the nature of Johnson's reaction to French's conduct. French contends that during the second conversation, Johnson defamed her and placed her in danger of physical contact by calling her a terrible nurse and by throwing up her hands and pointing a finger at French.

The next day, October 13, French received a six-day suspension notice from Andreen based on her failure to be forthcoming with the fact that she had not given the dying patient the authorized morphine and for improperly identifying medications. The notice also suggested that French use the suspension time to review medication administration procedures. While French did not sign the suspension notice as Andreen requested, she conceded in her deposition that the suspension notice did not constitute a termination and that her supervisors did not inform her that she was being discharged from her employment. (*See* French Dep. at 161.) On October 16, 1993, French tendered a handwritten termination notice to Eagle. The

---

1. Defendant William J. Eagle, Chief Executive Officer and sole shareholder of Eagle Nursing Home, Inc., died on November 14, 1996, after French filed the instant action.

parties dispute when French's resignation was to become effective; however, it is clear that French did intend to leave her position at Eagle.

French submitted a handwritten note concerning the pay discrepancy between male and female nurses at Eagle to the Minnesota Department of Human Rights ("MDHR"). Although the note was dated October 7, 1993, French cannot recall the date that she mailed the note to the MDHR. None of the Defendants claim to have known about French's correspondence with the MDHR until after October 16, 1993, the date of French's resignation. French maintains that the Defendants learned that she was filing a complaint with the MDHR prior to suspending her. On October 22, 1993, the MDHR sent French a letter stating that it was unable to draft a charge in her case and requesting additional information and evidence.

In February 1994, Andreen notified the Minnesota Board of Nursing ("the Nursing Board") of French's October 1993 suspension. Andreen contends that she was reminded to report the suspension by a continuing education seminar that she attended the day before she notified the Nursing Board. French disagrees, characterizing Andreen's delay in reporting the suspension as retaliation for French's MDHR complaint. Consequently, in May 1994, the Nursing Board sent French a Notice of Conference containing allegations of French's noncompliance with the Nurse Practices Act. French has met with Nursing Board representatives to present her version of the allegations, and the Nursing Board's investigation remains open.

French filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in April 1994. In the complaint, French claimed that she had been harassed, denied equal pay, unfairly disciplined, and forced to resign, all due to her gender. (See French Dep. Ex. 13.) As a result of French's allegations, the EEOC filed suit against Eagle for violations of the Equal Pay Act. See EEOC v. Eagle Nursing Home, Civil File No. 3–96–188 (D.Minn.) The parties settled the EEOC litigation after French signed a release on January 23, 1997, waiving

"any and all claims for equal pay during my employment at Eagle Nursing Home that I may have. . . ." in exchange for a payment of $20,000.00 from Eagle. (French Dep. Ex. 2.) French did not release any claims of other discrimination, harassment, constructive discharge, aiding and abetting, retaliation, negligent infliction of emotional distress, tortious interference with contract, or defamation. (See id.)

French filed the instant action on January 19, 1996, alleging violations of Title VII and the Equal Pay Act (Count I); discrimination, harassment, and constructive discharge in violation of the Equal Pay Act, Title VII, and the Minnesota Human Rights Act ("MHRA") (Count II); aiding and abetting and retaliation in violation of Title VII and the MHRA (Count III); negligent infliction of emotional distress (Count IV); tortious interference with contract (Count V); and defamation (Count VI). Count I was dismissed with prejudice pursuant to a Stipulation and Order for Partial Dismissal filed with the Court on March 4, 1997. French v. Eagle Nursing Home, Inc., Civil File No. 3–96–67 (D.Minn. Mar. 4, 1997) (stipulation and order for partial dismissal) (Clerk Doc. No. 22). The Eagle Defendants and Defendants Steven Winthrop and Eagle Nursing Home and Convalescent Center, Inc. ("Convalescent Center") move the Court for summary judgment on all remaining counts of the Complaint. The Court will consider each of French's claims in turn.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219–20 (8th Cir.1992). In evaluating a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). To determine whether genuine issues of material fact exist, the court conducts a two-part inquiry. The court deter-

mines materiality from the substantive law governing the claim. *See id.* at 248, 106 S.Ct. at 2510. Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *See id.* If the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party, a material fact dispute is "genuine" and precludes summary judgment. *See id.* at 248–49, 106 S.Ct. at 2510–11.

## I. Claims Against Eagle Nursing Home and Convalescent Center, Inc.

In a sworn affidavit, Winthrop informs the Court that the Convalescent Center was incorporated in 1995 and, while it took the actions necessary to incorporate, it never engaged in any corporate action. (*See* Winthrop Aff. ¶ 2.) According to Winthrop, the Convalescent Center has never conducted any business, including operating a nursing home, and is not a successor in interest to Eagle. (*See id.*) French does not dispute Winthrop's assertions and did not object at oral argument to the dismissal of the Convalescent Center from this action. To be liable as a successor in interest, the Convalescent Center must have purchased or otherwise received all of Eagle's assets and must have expressly or impliedly agreed to assume Eagle's debts, the transaction must have amounted to a merger or consolidation of the two companies, the Convalescent Center must be a mere continuation of Eagle, and the transaction must have been entered into fraudulently to escape liability for Eagle's debts. *See Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn.1989). None of these elements applies to the Convalescent Center's relationship with Eagle. For these reasons, the Court hereby dismisses all claims against the Convalescent Center with prejudice.

## II. Discrimination, Harassment, and Constructive Discharge (Count II)

### A. *Unequal Pay Claims*

In Count II of her Complaint, French alleges that all Defendants harassed her and discriminated against her on the basis of her gender in violation of the Equal Pay Act, Title VII, and the MHRA. The Equal Pay Act provides that

No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d)(1). After carefully reviewing the Complaint, the Court can discern no distinction between the Equal Pay Act claim that French raised in Count I, which was dismissed with prejudice, and her Equal Pay Act claim in Count II. Therefore, French's Equal Pay Act claim under Count II of the Complaint is dismissed with prejudice.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). The MHRA similarly prohibits employment discrimination based on an employee's gender. *See* Minn.Stat. § 363.03, subd. 1(2). In her Complaint, French contends that "Defendants, through their agents and employees, have discriminated and continue to discriminate against plaintiff because of plaintiff's sex with respect to the failure to pay equal wages, the unlawful suspension, the constructive discharge and disparate discipline, compensation, terms, conditions, work hours, and privileges of employment." (Compl.¶ 43.) The bulk of the facts set forth in Count II refer to French's unequal pay claims. (*See. e.g.,* Compl. ¶¶ 45, 46, 48.) To the extent that French is attempting to relitigate these unequal pay claims, such claims are barred pursuant to the "Individual Release" that French executed on January 23, 1997. By signing the release, French

knowingly and voluntarily waive[d] any and all claims for unequal pay during [her] employment at Eagle Nursing Home that [she] may have, under federal, state, local,

or common law, arising from the factual allegations that Eagle Nursing Home, Inc. paid certain female licensed practical nurses (LPNs) less than male LPNs, for substantially equal work....

in exchange for a payment of $20,000.00. (French Dep. Ex. 2.) The release is not limited to pay disparity claims filed under the Equal Pay Act, but rather includes claims filed under federal and state law as well. The effect of a release is to extinguish the cause of action. *See Adams v. Cavanagh Communities Corp.,* 669 F.Supp. 870, 876 (N.D.Ill.1987) (citing *Pellett v. Sonotone, Corp.,* 26 Cal.2d 705, 160 P.2d 783, 787 (1945)). Therefore, summary judgment is granted on French's Title VII and MHRA claims to the extent that those claims seek to remedy unequal pay by Eagle.

### B. *Other Claims of Gender Discrimination*

■ French's Complaint also contains allegations that the Defendants gave better working conditions and hours and more overtime to male LPNs, permitted male employees but not female employees to leave the worksite for meals, and disparately disciplined male and female employees. (*See* Compl. ¶¶ 46, 48.) In the section of her Memorandum in Opposition entitled "Sex Discrimination and Harassment," however, French provides substantiating facts only for her claims of unequal pay. (*See* Mem. Opp'n Defs.' Mots. Summ. J. at 17–19.) Simply put, French has not established a prima facie case of harassment and discrimination on the basis of gender against any of the Defendants because she has not alleged a single supported fact to substantiate her Title VII or MHRA claims other than the dismissed unequal pay claims. *Cf. Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552 (holding that summary judgment is mandated when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The Court is by no means obligated to examine all of French's submissions to locate factual support for her claims if she does not direct the Court to that information. *See White v. McDonnell Douglas Corp.,* 904 F.2d 456, 458 (8th Cir.1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.") (quotations omitted). The Defendants are entitled to summary judgment due to French's absolute failure to allege facts in support of her sex discrimination claim.

### C. *Constructive Discharge*

French also contends that she was constructively discharged in violation of Title VII and the MHRA. For purposes of this analysis only, the Court will assume, contrary to its decision above, that French has set forth facts sufficient to make out a claim of sex discrimination.

Because it is undisputed that French resigned from Eagle rather than being actually discharged, French must demonstrate that Eagle constructively discharged her in order to establish a prima facie case of sex discrimination. *See Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 796 (8th Cir.1996); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981). Constructive discharge occurs "when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job." *Smith v. World Ins. Co.,* 38 F.3d 1456, 1460 (8th Cir.1994) (quotations omitted); *accord Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996); *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir. 1995). Courts must employ an objective standard when evaluating constructive discharge claims. *See West,* 54 F.3d at 497. In other words, "[a]n employee may not be unreasonably sensitive to [her] working environment. A constructive discharge arises only when a reasonable person would find [her working] conditions intolerable." *Id.* (quoting *Johnson,* 646 F.2d at 1256). An employee who resigns her employment without giving her employer a reasonable opportunity to resolve an issue is not constructively discharged. *See id.* at 498.

A claim of constructive discharge asserts a violation of Title VII and the MHRA when

the employee resigns to escape intolerable working conditions caused by illegal discrimination. *See Tidwell,* 93 F.3d at 494; *Continental Can Co. v. State,* 297 N.W.2d 241, 251 (Minn.1980). The employee must prove that the employer deliberately created the intolerable working conditions with the intention of forcing the employee to quit. *See Tidwell,* 93 F.3d at 494. To satisfy this requirement, the employee can demonstrate that her resignation was a reasonably foreseeable consequence of the employer's discriminatory actions. *See id.; Smith,* 38 F.3d at 1461.

■ Nowhere in either of her memoranda of law does French set out for the Court the specific conditions of her employment that she found so intolerable that she submitted her "termination" notice on October 16, 1993. In fact, French's memoranda do not even recite the case law relevant to a claim of constructive discharge. The general allegations contained in French's Complaint that male employees experienced better working conditions and hours and received more overtime than female employees, that male employees were permitted to leave the worksite for meals where female employees were not, and that the Defendants disparately disciplined male and female employees, (*see* Compl. ¶¶ 46, 48), if true, are insufficient to demonstrate working conditions so intolerable that French was compelled to resign. *Cf. Tidwell,* 93 F.3d at 495–96 (finding evidence that employer repeatedly acted in racially discriminatory manner in making shift assignments and denied employee a promotion because of his race to be insufficient to demonstrate intolerable working conditions); *Allen,* 81 F.3d at 796–97 (finding that employee's allegations that his hours were reduced where the hours of younger, part-time employees were increased, that his overtime was therefore limited, that he was suspended without pay, that his transfer request was denied, and that he was told to quit if he did not like it, if true, did not raise a genuine issue of material fact that his working conditions were intolerable, and granting summary judgment in favor of employer).

■ While Eagle's supervisory staff, including Defendants Andreen, Martinson, and Johnson, may have behaved unpleasantly toward French by criticizing her job performance and shouting at her on October 12, 1993, these conditions alone, as a matter of law, do not constitute an intolerable work environment. *Cf. Hanenburg v. Principal Mut. Life Ins. Co.,* 118 F.3d 570, 574–75 (8th Cir.1997) (holding that employee who was scrutinized and reprimanded more than other, similar workers did not experience intolerable working conditions even though such treatment may have made her employment less enjoyable and caused her stress); *Tidwell,* 93 F.3d at 497 (holding, in case with comparable facts, that "[w]hile the conditions under which [the employee] worked may have been unpleasant and tinged with discriminatory acts, they do not create an intolerable atmosphere that would allow [his] quitting to be considered a constructive discharge"). In addition, unequal pay, standing alone, generally does not support a finding of constructive discharge. *See Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir. 1980). This is especially true where, as here, most female LPNs were treated the same as French, at least in terms of compensation. *Cf. Allen,* 81 F.3d at 797 (stating that employer's similar treatment of other employees mitigated against finding of intolerable working conditions).

The six-day suspension that French received on October 13, 1993, would not have led a reasonable person to believe that she would be discharged, especially in light of the suggestion contained in the suspension notice that French use the six-day period to review medication administration in preparation for her return. *Cf. id.* (finding that three-day suspension did not imply employer's desire to discharge employee). Even more damaging to French's constructive discharge claim is her request to return to work at Eagle on a part-time or on-call basis after her suspension and subsequent termination. (*See* French Dep. Ex. 4, at 19; Pl.'s Mem. Opp'n Defs.' Mots. Summ. J. at 11.) It strains credulity that French would wish to return voluntarily to a work environment that was so intolerable that she was compelled to resign. The only logical conclusion that the Court can draw from French's wish to return

to Eagle is that the working conditions there were in fact not intolerable.

Because French has failed to set forth facts sufficient to support her allegation of constructive discharge, she has failed to establish a prima facie case of gender discrimination under Title VII and the MHRA. Therefore, all Defendants are entitled to summary judgment with respect to all claims contained in Count II of the Complaint.

### III. Aiding and Abetting and Retaliation (Count III)

#### A. ·Retaliation

In Count III of her Complaint, French alleges that all Defendants retaliated against her for reporting or bringing claims of unequal pay, sex discrimination, harassment, disparate treatment, and retaliation, in violation of Title VII and the MHRA. (*See* Compl. ¶¶ 62–64.) Both Title VII and the MHRA prohibit discrimination against an employee for opposing any practice made unlawful under each statute. *See* 42 U.S.C. § 2000e–3(a); Minn.Stat. § 363.03, subd. 7(1). In other words, an employer may not retaliate against an employee for complaining about or bringing charges of sex discrimination.

To establish a prima facie case of unlawful retaliation under Title VII, a plaintiff must show that (1) she participated in a statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection existed between the protected activity and the adverse employment action. *See West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir.1995) (quoting *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981)). If the plaintiff establishes a prima facie case, the defendant must advance a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiffs. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270–71 (8th Cir.1996). If the

defendant articulates such a legitimate, non-discriminatory reason, the burden shifts to the plaintiff to demonstrate that the defendant's reason for the employment action was a pretext for sex discrimination. *See Stevens*, 97 F.3d at 271. The burden of proving unlawful retaliation remains with the plaintiff at all times. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Minnesota state courts have adopted this three-part burden-shifting test when analyzing employment cases filed pursuant to the MHRA. *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–20 (Minn.1986).

#### 1. *Prima Facie Case*

The Court will assume for purposes of summary judgment that French's repeated requests that Eagle compensate female LPNs at the same hourly wage as male LPNs constitute a protected activity under Title VII and the MHRA, despite the Eagle Defendants' argument to the contrary. The Court will also assume that French's suspension was an adverse employment action for purposes of this analysis.[2] *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997) (finding that "actions short of termination may constitute adverse actions within the meaning of the statute").

As for the causal connection element, French claims that she began receiving negative performance evaluations shortly after she first complained about the pay disparity and that she was suspended a few days after writing and sending a letter to the MDHR about the unequal pay issue. French also contends that when Donovan Bjorklund, a male LPN, told Andreen that French had asked to see his pay stub, Andreen replied, "[w]ell good, that's just more to get on her." (Walsh Aff. Ex. 5 at 7 (hereinafter "Bjorklund Aff.")) Bjorklund believed that Andreen and others were "trying to get rid of" French because "she was causing trouble regarding salaries." (*Id.*) While the parties dispute whether any of the Defendants learned that French had written a letter to the MDHR

---

**2.** Constructive discharge, which was alleged by French, is also an adverse employment action that will support a claim of unlawful retaliation. *See West*, 54 F.3d at 497. Because the Court has

already considered and rejected French's claim of constructive discharge, however, such discharge cannot be included in the Court's analysis of the retaliation claim.

before French's suspension on October 13, 1993, the Court will accept French's version of the facts and assume that at least one Defendant became aware of French's letter prior to the suspension. A temporal connection between protected activity and an adverse employment action may not, on its own, be sufficient to establish a causal connection. *See Stevens*, 97 F.3d at 271. Because French has also presented opinion evidence in support of her retaliation claim, however, the Court will assume without deciding that French has established a prima facie case and continue with the three-part *McDonnell Douglas* analysis.

### 2. *Legitimate, Nondiscriminatory Reason*

To rebut French's prima facie case, Eagle "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1095–96. The Eagle Defendants have offered several legitimate, nondiscriminatory reasons for French's suspension stemming from the incident that occurred on October 12, 1993. According to the suspension notice issued by Andreen, French was suspended because Johnson believed that French had been deceptive when Johnson asked French whether French had administered pain medication to a terminally ill resident, that French had improperly assessed whether the resident was in pain, and that French was unfamiliar with a prescribed antibiotic. (*See* French Dep. Ex. 6.) The notice also stated that French had "failed to demonstrate an acceptable level of nursing practice ... regarding resident assessment, follow-up, or medication knowledge" and that her "overall nursing care remains marginal." (*Id.*) The Court finds that the Defendants' proffered reasons for French's suspension are legitimate and nondiscriminatory and thus that the Defendants have satisfied their burden under the *McDonnell Douglas* test.

### 3. *Pretext*

█ French must now produce admissible evidence to demonstrate that the Defendants'

reasons for her suspension were a mere pretext for retaliation. French may establish pretext directly, by showing that a retaliatory reason more likely motivated the Defendants, or indirectly, by demonstrating that the Defendants' explanation is unworthy of credence. *See Jackson v. Delta Special Sch. Dist. No. 2*, 86 F.3d 1489, 1494 (8th Cir.1996). In support of her position, French contends that suspension was an unreasonably harsh and disproportionate punishment for her discretionary decision not to administer morphine to Resident E.L. French claims that Scott Toombs, a male LPN, had cared for Resident E.L. during the two previous nights and had not administered morphine.[3] Toombs was not suspended or otherwise disciplined for his decisions. (*See* Toombs Aff. ¶ 14.) French also claims that once she began complaining about the pay disparity for LPNs in late April or early May 1993, her performance reviews became increasingly negative, and Andreen and Johnson began to treat her more poorly than the other LPNs.

French has failed to put forward evidence sufficient to establish that the Defendants were more likely motivated by a retaliatory reason when they suspended French or that the Defendants' proffered reasons for the suspension are unworthy of credence. Turning first to the October 12 incident, French has not shown that she and Toombs were similarly situated when they were disparately disciplined. French was working the day shift when she was caring for Resident E.L.; Toombs was working the night shift. As French herself has stated, the LPNs who work the night shift rarely come into contact with the supervisory staff and thus receive much less oversight and are less likely to be confronted about a specific patient. In an analogous race discrimination case, the Eighth Circuit required the plaintiff, who was African–American, to show a similarity between his conduct and that of white employees not discharged in order to prove pretext. *See Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1255 (8th Cir.1981). The *Johnson* plaintiff contended that his dis-

---

**3.** Scott Toombs's affidavit indicates that although he did not administer morphine to Resident E.L., he did give her a Tylenol suppository. (*See* Walsh Aff., Ex. 5 ("Toombs Aff"), at ¶ 14.) The Court assumes that Toombs administered the Tylenol to alleviate Resident E.L.'s pain.

charge for insubordination constituted race discrimination because he had been fired for swearing at an assistant supervisor, while a white coworker had done the same without discipline. *See id.* The court determined, however, that the supervisor had overheard the plaintiff's swearing but did not hear the white coworker swear. *See id.* Furthermore, the only other incident where the supervisor had witnessed swearing at one of his assistants had resulted in the discharge of the white worker who had indulged in that behavior. *See id.* at 1255–56. The Eighth Circuit concluded that blacks and whites who engaged in similar conduct were treated identically. *See id.*

Here, French has not shown that she and Toombs were similarly situated. Toombs's failure to give morphine to Resident E.L. was not observed by Johnson. Moreover, Toombs did administer a milder form of pain reliever to Resident E.L. during his shift. French does not challenge the Defendants' assertion that Resident E.L. was administered morphine three times during the day shift on the previous day. French was suspended not only for failing to give morphine to Resident E.L., but also because Johnson believed that French had misled her about giving the morphine and that French did not know the difference between morphine and an antibiotic. (*See* French Dep. Ex. 6.) French has presented no evidence that any other LPN, including Toombs, had a similar confrontation with Johnson. Because French and Toombs were not similarly situated when they engaged in the same conduct, the fact that they were differently treated does not demonstrate pretext.

Moreover, French submits no evidence to show that Toombs, or any other LPN who had not administered morphine to Resident E.L., had French's record of poor performance reviews. French maintains that her poor reviews were themselves a product of retaliation for her complaints, but unrebutted documentary evidence disproves that contention. The record before the Court includes documented evidence of marginal performance by French that predates her complaints about the pay disparity. In June 1992, Andreen sent French a memo criticiz-

ing French's failure to take notes about a patient, chart vitals, assess pain or administer pain medication, and provide oxygen to an ill patient. (*See* French Dep. Ex. 5.) French's performance was reviewed by an independent pharmacy consultant in March 1993. The consultant's report noted four problem areas in French's passing of medications, including failure to use the six standards of proper medication administration and failure to use a three-check system when taking medication from the cart. (*See* French Dep. Ex. 19.) A reevaluation six months later showed improvement, but French continued to have trouble with infection control and with the proper administration of medications. (*See* French Dep. Ex. 23.) In April 1993, shortly before French began questioning the pay disparity, Andreen conducted an evaluation of French's performance. Andreen found that French's job performance needed improvement in over half of the areas evaluated, including job knowledge and quality of work. (*See* French Dep. Ex. 20.) As a result of this review, Marci Martinson conducted a full-day, one-on-one reorientation session with French. (*See* French Dep. Ex. 21.) A reevaluation by Andreen and Martinson in September 1993 noted improvement in French's nursing practice, but problem areas remained. (*See* French Dep. Ex. 22.) French concedes that in July 1993, Johnson directly observed French experience difficulty in starting oxygen flow to a resident. (*See* French Dep. at 228–32.) French told Johnson that she "wasn't sure if [she] was doing it right," so Johnson stepped in to assist. (*See id.* at 231.) French was also criticized for tardiness.

French has provided the Court with no evidence of a causal link between French's complaints about the pay disparity and her poor performance reviews or her eventual suspension. The criticisms and confrontations that occurred after April 1993 involved the same concerns that the staff had expressed prior to the dispute. Indeed, the evidence of pretext that French does present, regarding unequal disciplinary measures for tardiness, involved Connie Houchin, another female LPN. While one witness, Donovan Bjorklund, states that male employees were

never written up for being tardy, neither does he indicate that they were regularly late. Rather, Bjorklund believed that the Defendants were "cracking down" on tardiness and that everyone was being written up, with the exception of two female nurses. (*See* Bjorklund Aff. at 8.) If anything, the evidence presented indicates a personality conflict between French and her supervisors, which does not rise to the level of a Title VII or MHRA violation without additional evidence of retaliation. *Cf. Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992) (holding that personality conflicts between plaintiff and other employees, including supervisor, did not rise to the level of a discriminatorily hostile working environment actionable under Title VII.)

Finally, French claims that several other female LPNs complained to the Defendants about the pay disparity. (*See, e.g.*, Pl.'s Mem. Opp'n Defs.' Mots. Summ. J. at 7; Bjorklund Aff. ¶¶ 6-7.) Tellingly, French has not submitted a shred of evidence that the Defendants disciplined, suspended, or otherwise retaliated against any of the other complaining LPNs. The evidence, viewed in the light most favorable to French, leads the Court to the inevitable conclusion that French was suspended because her supervisors doubted her nursing abilities, not because she had complained about the pay disparity. Summary judgment is granted in favor of all Defendants on French's retaliation claim.[4]

### B. *Aiding and Abetting*

French alleges that Defendants William Eagle, Andreen, Martinson, Johnson, and Winthrop aided and abetted Eagle in discriminating and retaliating against her in violation of the MHRA. Minnesota Statutes section 363.03, subdivision 6, creates statutory liability for aiding or attempting to aid a person engaging in conduct forbidden by the MHRA. This Court has determined above that the corporate defendant, Eagle, did not engage in retaliation that was unlawful under the MHRA. *See supra*, Part III.A. Accord-

ingly, the individual defendants cannot be found to have aided and abetted a nonexistent MHRA violation. *See Maness v. Star-Kist Foods, Inc.*, Civ. No. 3–87–523, 1992 WL 541251, at *18 (D.Minn. Sept. 11, 1992), *aff'd*, 7 F.3d 704 (8th Cir.1993), *cert. denied*, 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 813 (1994).

Even if the Court had not granted summary judgment on the MHRA claims, however, French's aiding and abetting claims against the individual defendants are barred by the applicable statute of limitations. The MHRA contains a one-year statute of limitations. *See* Minn.Stat. § 363.03, subd. 3. The Minnesota Supreme Court addressed the issue of statute of limitations for aiding and abetting claims under the MHRA in *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695 (Minn.1996). In *Beaulieu*, the MDHR filed a complaint against both a corporate and an individual defendant, alleging sex discrimination. The Court held that because the individual defendant was not included in the initial charges filed by or with the Commissioner of the MDHR, that defendant had not been notified that he was to be held personally liable for the discriminatory practices. *See id.* at 700. The individual defendant was not put on notice despite the fact that he, as owner of the corporate defendant, was aware of the nature of the charges and had participated in conciliation between his business and the MDHR. *See id.* The Court held that "[w]hen, as in this case, no charge has been filed by either a charging party or the Commissioner against the respondent alleging a discriminatory practice on the part of the respondent and the charges which were filed were not amended to include the respondent and no basis exists for tolling the limitations period, the claim is barred as untimely." *See id.*

The aiding and abetting claims against the individual defendants in the instant case are similarly time-barred. French, like the MDHR in *Beaulieu*, knew of any potential involvement by Defendants William Eagle, Andreen, Martinson, Johnson, and Winthrop

---

4. Defendant Steven Winthrop argues that he cannot be held liable under Title VII or the MHRA because there is no individual liability under either statute. Because the Court has deter-

mined that French's Title VII and MHRA claims fail as a matter of law as to all Defendants, individual and corporate, the Court declines to address the issue of individual liability.

at the time that charges were filed with the MDHR and the EEOC. Yet, contrary to French's claim, the individual defendants were not included in the section of the MDHR Intake Form that requested the names of the offending parties. (*See* Wallen–Friedman Aff. Ex. L.) Nor were they included in the Charge of Discrimination issued by the MDHR, the EEOC's Notice of Right to Sue (which does, contrary to French's claim, contemplate possible multiple respondents) (*see id.* at Ex. N), or the complaint filed by the EEOC against Eagle in federal district court. *See EEOC v. Eagle Nursing Home, Inc.,* Civil File No. 3–96–188 (D.Minn.). The individual defendants were given no notice that they could be held personally liable for French's discrimination claims until January 19, 1996, the date on which French filed her Complaint in this case. That date is well outside the one-year statute of limitations provided by the MHRA. French simply neglected to pursue the individual defendants by filing an aiding and abetting charge with the MDHR. The Court grants the individual defendants' motions for summary judgment as to the aiding and abetting claim in Count III of the Complaint.

## IV. Negligent Infliction of Emotional Distress (Count IV)

In Count IV, French claims that the Defendants negligently inflicted emotional distress upon her both by placing her in a zone of danger and by directly invading her rights.

### A. *Zone of Danger*

■ A person may recover damages for negligent infliction of emotional distress if she: "(1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations." *K.A.C. v. Benson,* 527 N.W.2d 553, 557 (Minn.1995). Whether the plaintiff was in a zone of danger is an objective question. *See id.* at 558.

The Minnesota Supreme Court has consistently held that actual physical impact is not a required element of a claim of emotional distress. *See id.* at 557–58. The Court first adopted the zone of danger test in *Purcell v.*

*St. Paul City Railway Co.,* a case involving a pregnant woman's miscarriage due to narrowly avoided cable car accident. 48 Minn. 134, 50 N.W. 1034 (1892). In finding for the plaintiff, the Court noted that the impending cable car collision "seemed so imminent, and was so nearly caused, that the incident and attending confusion of ringing alarm-bells and passengers rushing out of the car caused to plaintiff sudden fright and reasonable fear of immediate death or great bodily injury." *Id.* Other instances where plaintiffs were found to be within the zone of danger include the case of a woman who, while in a department store dressing room, heard a noise like an explosion and witnessed the collapse of a wall, although she herself merely got dusty, *see Okrina v. Midwestern Corp.,* 282 Minn. 400, 165 N.W.2d 259, 261 (1969), and the case of a man who experienced a sudden 34,000–foot drop in elevation due to the out-of-control tailspin of the commercial aircraft in which he was a passenger. *See Quill v. Trans World Airlines, Inc.,* 361 N.W.2d 438, 440 (Minn.Ct.App.1985).

■ French has not alleged any incident other than her confrontation with Johnson on October 12, 1993, that could have possibly placed French in a zone of danger. Johnson must be a formidable woman indeed for one to seriously consider that by pointing at French, raising her hands to her head, and shouting from a distance of fifteen inches, (*see* French Dep. at 145–49, 270–71.), Johnson placed French in actual personal physical danger. The Court does not believe that Johnson placed French in "a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time." *K.A.C.,* 527 N.W.2d at 558. Moreover, French offers nothing beyond conclusory statements to demonstrate that she has suffered the required emotional distress with attendant physical manifestations. In her deposition, she conceded that the hives, ulcers, and other manifestations of stress alleged in her Complaint have been chronic problems since the 1960s. (*See* French Dep. at 367–87.)

### B. *Direct Invasion of Rights*

A plaintiff can recover for negligent infliction of emotional distress without alleging

physical injury if she can prove that her employer directly invaded her rights. *See State Farm Mut. Auto. Ins. Co. v. Village of Isle,* 265 Minn. 360, 122 N.W.2d 36,41 (1963). French's allegations of retaliation and defamation, if true, would constitute examples of such an invasion of rights. *See id.* The Court has determined that French's rights have not been directly invaded, *see supra,* Part III.A.; *infra,* Part VI. Therefore, French's claim for emotional distress based on a direct invasion of her rights cannot stand. Because French has not introduced a genuine issue of material fact as to her claim for negligent infliction of emotional distress, the Defendants are entitled to summary judgment on Count IV of the Complaint.

### V. Tortious Interference with Contract (Count V)

French contends that the Defendants tortiously interfered with her employment contract with Eagle, specifically alleging that they harassed and defamed her, treated her unequally, and wrongfully disciplined her in hopes of inducing her to resign her position. Under Minnesota law, to prevail on a claim for tortious interference with an employment contract, a plaintiff must prove the following: (1) the existence of a contract; (2) defendant knew of the contract; (3) defendant intentionally procured a breach of the contract without justification; and (4) plaintiff suffered injuries as a direct result of the defendant's actions. *See H Enters. Int'l, Inc. v. General Elec. Capital Corp.,* 833 F.Supp. 1405, 1419 (D.Minn.1993); *Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 900 (Minn.1982). As a matter of law, however, a party cannot tortiously interfere with its own contract. *See Ulrich v. City of Crosby,* 848 F.Supp. 861, 872 (D.Minn.1994); *Nordling v. Northern States Power Co.,* 478 N.W.2d 498, 505 (Minn.1991); *Bouten,* 321 N.W.2d at 900–01. Furthermore, the Minnesota Supreme Court has stated

> If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort.

*Nordling,* 478 N.W.2d at 505. An agent may be personally liable for tortious interference, however, if he has acted outside the scope of his duties. *See id.* at 506; *Bouten,* 321 N.W.2d at 901.

In the instant case, it is clear that Eagle is entitled to summary judgment on French's tortious interference claim. Furthermore, French has failed to provide sufficient evidence that any of the individual defendants were acting outside of the scope of their supervisory duties in managing or disciplining her. The Court has granted summary judgment in favor of the Defendants on all claims of harassment, defamation, and disparate treatment. None of these claims, therefore, can provide a reasonable basis for the Court to infer that the individual defendants ever acted outside the scope of their employment. This claim further fails in that the French was not "terminated" from her employment. The suspension given to French was temporary and was accompanied by a recommendation as to how she could improve her job performance. Because her claim for constructive discharge has been dismissed, French cannot say that she left her employment other than voluntarily. Consequently, the Court grants the Defendants' motions for summary judgment as to Count V of the Complaint.

### VI. Defamation (Count VI)

Finally, in Count VI of the Complaint, French asserts claims of defamation against all Defendants. In order for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower her in the estimation of the community. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980); *accord Richie v. Paramount Pictures Corp.,* 544 N.W.2d 21, 25 (Minn.1996). A claim for defamation "must be pled with a certain degree of specificity." *Schibursky v. IBM,* 820 F.Supp. 1169, 1181 (D.Minn.1993) (citations omitted). While it is not necessary for the complaint to recite the exact language spoken, the plaintiff

must identify who made the defamatory statement and what was said. *See id.*

In her Complaint, French maintains that "Defendants falsely claimed plaintiff was incompetent to practice nursing. Defendants called her a 'terrible nurse' and said that 'she shouldn't be working' in the nursing field." (Compl.¶ 91.) She also alleges that "Defendants" defamed her by submitting a statement to the Nursing Board. (*See id.* ¶ 95.) These three statements are the only specific claims of defamation contained in the Complaint. Nowhere in the Complaint does French identify the speaker of the statements as required by *Schibursky.* In her opposition brief, French indicates that Johnson spoke the above-quoted words and that Andreen submitted the statement to the Nursing Board. (*See* Pl.'s Mem. Opp'n Defs.' Mots. Summ. J. at 24.) She also contends that Andreen, Martinson, and Johnson defamed her by claiming that French did not know the difference between morphine and an antibiotic. (*See id.*) At best, French has alleged defamation claims against Andreen, Martinson, and Johnson. She has failed to state defamation claims against the remaining Defendants.

■ A potentially defamatory statement is not actionable if it was conditionally privileged and the privilege was not abused. *See Hunt v. University of Minn.,* 465 N.W.2d 88, 92 (Minn.Ct.App.1991) (citing *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 889 (Minn.1986)). To be privileged, a statement must be made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause. *See id.; see also Eldeeb v. University of Minn.,* 864 F.Supp. 905, 912 (D.Minn.1994), *aff'd,* 60 F.3d 423 (8th Cir.1995). A plaintiff can overcome a conditional privilege only by proving that the speaker acted with malice. *See Hunt,* 465 N.W.2d at 92. Whether a conditional privilege exists in a particular context is a question of law. *See id.; see also Eldeeb,* 864 F.Supp. at 912.

■ Johnson's statements that French was a "terrible nurse" and that she "shouldn't be working" in nursing, while indicating an unfortunate lack of self-control, are protected by conditional privilege. The statements were made on a proper occasion—the criticism of a subordinate by a supervisor—and for a proper motive—Johnson believed that French had been derelict in her responsibilities toward Resident E.L. Based on French's history of marginal performance reviews, Johnson's criticism of French was based on reasonable or probable cause. French has presented no tangible evidence that Johnson acted with malice or in bad faith. Consequently, Johnson's statements on October 12, 1993, were conditionally privileged and are not actionable.

■ Moreover, statements that cannot reasonably be interpreted as stating actual facts are constitutionally protected. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990). The four-factor test developed by the federal circuit courts to distinguish opinion from fact is helpful in determining whether a statement implies actual facts. The test considers (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement was made; and (4) the statement's public context. *See Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302–03 (8th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). This test has been adopted by the Minnesota courts. *See Hunt,* 465 N.W.2d at 93. Johnson's statements that French was a "terrible nurse" who "shouldn't be working" in the nursing field are clearly statements of opinion that cannot reasonably be interpreted as stating actual facts. The statements are neither precise nor verifiable and cannot be proven true or false. Therefore, they are not defamatory. *See Thompson v. Campbell,* 845 F.Supp. 665, 680 (D.Minn.1994) (statements that employee was a "complainer" and a "troublemaker" were too imprecise and lacking in verifiability to be defamatory); *Schibursky,* 820 F.Supp. at 1182–83 (same as to statements that employee was "hard to work with" and "rude"); *Geraci v. Eckankar,* 526 N.W.2d 391, 397 (Minn.Ct.App.) (same as to statements that employee was "out of control," "emotional," and a "bad influence"), *cert. denied,* —— U.S. ——, 116 S.Ct. 75, 133 L.Ed.2d 34 (1995); *Hunt,* 465 N.W.2d at 91, 94–95 (holding that

statements by an employer that a former employee "lacked warmth, was insincere, and had no sense of integrity" were not defamatory because they could not be proven true or false).

■ Andreen's statement to the Nursing Board is also not defamatory. As Director of Nursing, Andreen was statutorily required to report French's suspension and the reasons for it to the Nursing Board. *See* Minn.Stat. § 148.263, subd. 2 (providing that the chief nursing executive of a health care institution "shall report to the [Nursing Board] any action taken by the institution ... to revoke, suspend, limit, or condition a nurse's privilege to practice in the institution....") The chief nursing executive is "immune from civil liability or criminal prosecution for submitting in good faith a report to the board under § 148.263...." Minn.Stat. § 148.264, subd. 1. French has provided no evidence that the report that Andreen submitted to the Nursing Board about French's suspension, while tardy, was made in anything other than good faith. Nowhere does French dispute Andreen's assertion that she was reminded of her duty to report French's suspension and subsequent resignation by her attendance at a nursing seminar in February 1994 or that she submitted her report shortly thereafter. (*See* Orbovich Aff. Ex. A at 6.) Because the statements that French contends constitute defamation either are protected by qualified immunity or are not defamatory, the Defendants are entitled to summary judgment on Count VI of the Complaint.

## CONCLUSION

Plaintiff Rozmeree French has failed to point the Court to any genuine issues of material fact with regard to any of the six counts contained in her Complaint. She released all of her claims that were based on allegations that the Defendants compensated male LPNs at a higher rate than female LPNs for equal work. As for her claims of sex discrimination and retaliation, French has failed to assert facts to support a connection between her gender or her complaints about the pay disparity and any actions taken by any of the Defendants, including disparate discipline and suspension. French's claims of negligent infliction of emotional distress, tortious interference with contract, and defamation also fail as a matter of law. Consequently, the Court grants summary judgment in favor of all Defendants on all counts of the Complaint.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. The Motion for Summary Judgment of Defendants Eagle Nursing Home, Inc., William J. Eagle, Jan Andreen, Marci Martinson, and Kathy Johnson (Clerk Doc. No. 31) is GRANTED;

2. The Motion for Summary Judgment of Eagle Nursing Home and Convalescent Center, Inc. and Steven Winthrop (Clerk Doc. No. 26) is GRANTED; and

3. The Complaint (Clerk Doc. No. 1) is DISMISSED WITH PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**